**M. M. TRAVIS, Plaintiff,**

v.

**MIDWAY OIL CORPORATION, a Wyoming corporation, M. N. Wheeler and H. Leslie Parker, Defendants.**

Civ. No. 3777.

United States District Court
D. Wyoming.

Oct. 5, 1956.

Frederic L. Kirgis and Raymond C. Johnson (of Gorsuch, Kirgis, Campbell, Walker & Grover), Denver, Colo., and Vincent Mulvaney, Cheyenne, Wyo., for plaintiff.

W. J. Wehrli, Casper, Wyo., for defendants.

KERR, District Judge.

This action stems from an erroneous interpretation placed by an employee of the Department of the Interior upon the expiration date of an oil and gas lease issued pursuant to the Mineral Lands Leasing Act of February 25, 1920, 41 Stat. 437, 30 U.S.C.A. § 181 et seq.

The undisputed facts, together with the admissions in the pleadings, affidavits, numerous exhibits offered and received in evidence, and argument of counsel convince the Court there is no genuine issue of fact involved in this controversy. Indeed, counsel for plaintiff state: "It does not appear to the plaintiff that there can be any question as to the basic facts in issue * * *". Counsel for defendants made a similar statement at the conclusion of his argument on his motion for judgment on the pleadings.

I shall proceed to consider defendants' motion for judgment on the pleadings as to the first and third causes of action and treat it as a motion for summary judgment under the provisions of Rule 56, Fed.Rules Civ.Proc. 28 U.S.C.A.

On January 26, 1931, defendants Parker and Wheeler were granted an oil and gas lease from the United States covering the following premises:

NE¼ Sec. 23 and S½ SE¼ Sec. 14, T. 35 N., R. 79 W., 6th P. M., Wyoming, containing 240 acres.

The lease was for a term of twenty years with a preferential right of renewal upon certain conditions for the successive periods of ten years and required Parker and Wheeler to pay a royalty of 5% on all oil and gas produced from said land. This lease constitutes the subject of the controversy.

On November 30, 1944, Wheeler and Parker assigned the aforesaid lease to the Midway Oil Corporation, but the Department of the Interior refused to approve the assignment for reasons set forth in a decision of the Department dated April 4, 1947. The substance of the refusal to approve the assignment was based upon regulations of the Department with which Parker and Wheeler failed to comply. It might be proper to state that Wheeler is the president of the Midway Oil Corporation and Parker is an officer of the corporation.

On September 24, 1948 Midway Oil Corporation entered into an operating agreement with Travis whereby Travis agreed to operate the lease for production of oil. The agreement provided that Travis would be in complete charge of all operations and that he would receive 75% of the oil produced.

On January 3, 1949 Travis and Midway Oil Corporation entered into an operating agreement supplement. The second agreement was amendatory to the agreement of September 24, 1948. The operating agreement supplement provided the parties were entering into a joint venture operating agreement and contained provisions amplifying the terms of the prior agreement. The record does not reflect any disagreement between the parties as to any provisions of the agreements.

The exhibits disclose the enterprise was a financial success and the parties profited from their venture. They had a ready market for their oil from responsible purchasers.

The peaceful and profitable operations were suddenly halted when on August 14, 1953 a petroleum accountant for the Department of the Interior in a letter addressed to Ameera Oil Company asserted the lease in question had expired on January 25, 1951. It questioned the right of Travis to produce oil from the lease and asserted that a renewal of the lease would carry 12½% royalty to the United States in lieu of the 5% royalty paid during the period of the primary lease. The letter attached a statement reflecting an unpaid balance of $13,346.66 due the United States representing the royalty on oil produced after January 25, 1951.

The purchasers of the oil being advised of the letter discontinued the purchase of oil for fear they would be trespassers as against the government. Hence there were no purchasers for the product.

For the above reasons plaintiff ceased operations from August 1953 to September 1954. On August 6, 1954 the Department gave permission to Travis to resume production pending the decision on the appeal in order to avoid damage to the shut down wells on the lease. The letter of permission stated in part: "The applicant (plaintiff) purports to be the operator of the lease on the basis of an assignment of operating rights from Midway Oil Corp., *the approved operator*

*of record."* (Italics supplied.) This letter would indicate the assignment from Parker and Wheeler to Midway was treated by the Department as an approved assignment.

The authorization to resume production was conditioned upon the execution of a bond in the amount of $5,000 and the payment of 25% of the proceeds of the oil produced and sold from said lease, such payments to be held in suspense by the United States for disposition upon and in accordance with the final adjudication of the pending appeal respecting said lease.

On November 30, 1953, following the Department letter of August 14, 1953 holding the lease had expired, the defendants filed an application for renewal of the lease upon the theory that the lease was still in effect. On April 22, 1954 the Chief, Branch of Leasing, Division of Minerals, Bureau of Land Management, held the lease had expired but a renewal would be granted at an increased royalty, provided the lease account was placed in good standing. Defendants took an appeal from this decision to the Secretary.

On March 18, 1955 the Acting Solicitor for the Department of the Interior rendered a decision for the Secretary of the Interior holding that the original lease remained in effect so long as oil is produced in paying quantities. The pleadings disclose and the parties admit there will be no appeal from the Solicitor's decision. Therefore the decision has become binding and effective and is the equivalent of a judgment of court. See Elliott v. Thompson, 63 Idaho 395, 120 P.2d 1014.

It is not in dispute that Travis is now producing oil from said lease in commercial quantities and operating under the joint venture agreement entered into by the parties.

Turning now to the pleadings. The gist of the complaint as to the first cause of action is in substance, as follows:

"By failing to remove from said lease the cloud created by the assertions of the agents of the United States, whether by paying the royalties claimed, under protest or otherwise, or by failing to obtain an exchange or renewal lease, or to take other proper action to remove such cloud, the Defendants have breached the Operating Agreement and the Supplement thereto, and the trust created therein by allowing said cloud to remain and causing the operating properties to be closed down, and Defendants have continued such breaches from January 26, 1951 to March 18, 1955."

Plaintiff's right of recovery, if any, is one for breach of warranty for failure of title. The warranty of title made by the defendants is found in the Operating Agreement of September 24, 1948. It states:

"First Party warrants its title to the lease hereinabove described, subject only to total government and overriding royalty payments of fifteen (15%) per cent, and agrees that *it will defend its title* and will also make, execute and deliver any further or additional assignments or conveyances which may be necessary to make this agreement effective, or to confirm in Second Party his right herein given to seventy-five (75%) per cent of the production from the lands above described." (Italics supplied.)

Ordinarily, in order to constitute a breach of warranty there must be a failure of title and an eviction from the premises. The showing of a superior outstanding title in a third person is essential in order to mature the right of action for a breach of the warranty. The warrantor is under no legal obligation to protect the warrantee against a mere trespass or against an unlawful claim. See Freeman v. Anderson, Tex. Civ.App., 119 S.W.2d 1081. The mere showing of a cloud on the title is insufficient.

Authorities hold that to constitute a breach of warranty the title or right under which the warrantee is evicted or to which he yields must be para-

mount and in existence on the date of the warranty. A warrantor is not ordinarily liable for damages sustained when an attack is made by a third party. See 21 C.J.S., Covenants, § 111, p. 976 and authorities cited.

■■ It is a well established principle of law that a vendee of land conveyed containing a covenant of general warranty has no recourse against the vendor until there has been an eviction by paramount title. In the case at bar the record fails to show that the plaintiff was dispossessed or evicted from the quiet and peaceful enjoyment of the occupancy of the premises, nor was he threatened with eviction.

In Gallison v. Downing, 244 Mass. 33, 138 N.E. 315, at page 317, the Court in discussing a breach of covenant stated:

"The covenant of warranty looks to the future and until broken runs with the land. Whenever the assignee or subsequent grantee of the land is evicted by paramount title, or is so disturbed in his title and possession by one having a paramount title as to be equivalent to an actual eviction or ouster, he has his remedy against the covenantor even though such covenantor is not his immediate grantor. *Eviction is that which constitutes a breach of the covenant of warranty*. When an eviction occurs, it is a breach of the covenant of warranty made by each of successive covenantors, whose covenants have all passed with the land and each is bound to a subsequent covenantee to make satisfaction for the breach. Thayer v. Clemence, 22 Pick. [Mass.] 490, 494; Whitney v. Dinsmore, 6 Cush. [Mass.] 124, 128; Kramer v. Carter, 136 Mass. 504, 508."

The above rule has been recognized by the Supreme Court of Wyoming in Hawkins v. Stoffers, 40 Wyo. 226, 276 P. 452, 456, 278 P. 76. Mr. Justice Blume ably announced the rule in the following language:

"There was in the case at bar no restoration or offer of restoration of the property, and hence the questions of mere want of title in the vendor or its insolvency or impossibility to perform are not at all in the case, and the plaintiff is in no position to recover herein by reason of the existence of these facts. His right to recover, accordingly, must necessarily be based, if he is entitled to recover at all, upon the fact that he was evicted from the premises or that he was deprived of his right by reason of a paramount title. It is said in 39 Cyc. 2009, that: 'Where a person in possession under an executory contract of sale is evicted, he may recover from the vendor the purchase price paid.' An examination of the various authorities cited will indicate, we think, that the eviction must be pursuant to a paramount title, and that when such eviction takes place, that fact authorizes rescission of the contract and recovery of the purchase price paid. The rule is that in order to recover on a covenant because of eviction, such eviction must be pursuant to a paramount title, unless notice, as hereinafter mentioned, is given. 7 R.C.L. 1197; 15 C.J. 1310. No reason exists why that rule should not be applied here. That, in fact, is conceded by counsel for respondent. If the eviction took place pursuant to such title, then, contrary to the contention of counsel for the appellants, no tender of the purchase price still unpaid was required to be made, since the law does not require a vain thing. Wilhelm v. Fimple, supra [31 Iowa 131]; Hawkins v. Merritt, supra [109 Ala. 261, 19 So. 589]; 27 R.C.L. 653; Warvelle, supra. § 925.

"The sole question before us, accordingly, is as to whether or not the respondent yielded to a paramount title. The burden to prove that rests upon him."

It would seem the reasoning in the above case, so far as justice is concerned, is fairly applicable in the case at bar.

Another case of interest is Andrus v. St. Louis Smelting & Refining Co., 130 U.S. 643, 9 S.Ct. 645, 32 L.Ed. 1054. I quote from the opinion at page 647 of 130 U.S., at page 646 of 9 S.Ct.:

"In the second place, the covenant in the deed for quiet possession merged all previous representations as to the possession, and limited the liability growing out of them. Those representations were to a great extent, if not entirely, mere expressions of confidence in the company's title, and the right of possession which followed it, against all intruders. The covenant was an affirmance of those statements in a form admitting of no misunderstanding. It was the ultimate assurance given upon which the plaintiff could rely, a guaranty against disturbance by a superior title. That covenant has not been broken. It is a covenant against disturbance by 'persons lawfully claiming' the premises or any part thereof. If the occupant holds by a paramount title, and thus lawfully excludes the purchaser from possession, the covenant is broken. *But it is not broken by a tortious disturbance.* If the occupation is without right, the remedy of the purchaser is to dispossess the intruder. His occupation does not constitute a breach of the covenant. Beebe v. Swartwout, 3 Gilman, [Ill.,] 162, 179; Kelly v. Dutch Church of Schenectady, 2 Hill, N.Y., 105, 111."

Counsel for plaintiff has prepared an excellent and exhaustive brief on the duties of a trustee. I find nothing in the agreements which impose on Midway any duty beyond defending its title to the lease. Certainly it was under no obligation to surrender a valid lease that carried a 5% royalty and receive in lieu therefor another lease on the same land which carried a 12½% royalty. Neither was it obligated to pay the sum of $13,-346.66 which the parties admit was not owing. Conversely it might be argued that Travis, being entitled to 75% of the production, had a greater obligation to meet the government's unwarranted demand than did the defendants. True, Travis suffered losses during the shut down period and the same is equally true of the defendants. The unfortunate incident was the fault of neither.

After a careful examination of the pleadings, exhibits, affidavits, admissions in counsels' argument, and the pretrial proceedings and viewing all in a light most favorable to the plaintiff I am constrained to hold that the defendants acted promptly and diligently in defending and protecting the title to the lease in question; that the law does not impose on a trustee responsibilities which it did not assume.

The motion filed by the defendants for judgment on the pleadings as to the first cause of action being treated as a motion for summary judgment is hereby sustained.

Turning now to plaintiff's third cause of action, he prays that he be decreed the ownership of an undivided interest in the lease. The material allegations of that action are:

"27. Plaintiff is owner of an undivided interest in United States oil and gas lease Cheyenne Serial No. 048864–A, or any lease which may be issued in exchange therefor, or any renewal or extension thereof, and is the owner of and is entitled to 75% of the oil produced, saved and sold from the above described lands, whether such oil be produced under the permission granted August 6, 1954, or under said oil and gas lease, or any lease which may be issued in exchange therefor, or any renewal or extension thereof.

"28. The Defendants claim or may claim some right, title or interest in and to the undivided interest of Plaintiff as set forth in Paragraph 27 hereof, or to the 75% of the oil produced, saved and sold which is described in Paragraph 27

hereof, which claims are adverse to the Plaintiff; but such claims of said Defendants, and each of them, are without foundation of right, either in law or equity."

These allegations are in direct conflict with the language employed by the parties in the operating agreement of September 24, 1948. Here I find the parties agreed that "Second Party (Travis) shall be and hereby is designated as the 'Operator' of the lease  *  *  *  and is hereby given the right to go upon said lands and rework said wells.  *  *  *  First Party (Midway) is the *owner of the lease* hereinabove described  *  *  *, First Party agrees that Second Party shall have and receive seventy-five (75%) per cent of the oil produced,  *  *  *", and again in the operating agreement supplement of January 3, 1949, "Record legal title to oil and gas lease covered by and appropriately identified in said prior dated operating agreement has from date of latter, been and is being held in trust by Midway,  *  *  *. Travis was *expressly designated* in and by said prior dated agreement *as field operator* of the covered field properties for said joint venturers, *such appointment* has thereafter remained effective continuously and it shall hereafter so continue *until revoked by either party hereto*,  *  *  *".

This language used in the agreements persuades me to the conclusion that the parties never intended to convey an undivided interest in the lease to Travis.

There is no allegation of fraud, misrepresentation, mistake, duress, ambiguity or other matters essential to empower a Court to rescind, modify or reform the agreements. It is an elementary principle of law and no authority need be cited, that Courts do not make contracts for the parties and they should interpret the language the parties have used and construe the contract they have entered into according to the intention of the parties.

For the above reasons I hold that the motion of the defendants for judgment on the pleadings as to the third cause of action being treated as a motion for summary judgment is hereby sustained.

Counsel for the defendants will prepare findings of fact and conclusions of law in conformity with this opinion, together with a judgment, allowing the proper exceptions to the plaintiff, within 20 days from this date, and the clerk will enter an order accordingly.